UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                          **Hon. Hugh B. Scott**

                                             06CR402S

SHAMEL PARKER,                              **Report**
                                            **&**
                    Defendant.              **Recommendation**

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B)

(Docket No. 9).  The instant matter before the Court is the portion of defendant's omnibus

motion seeking a motion to suppress seized evidence and statements (Docket No. 23[1]).

## BACKGROUND

Defendant was indicted on November 16, 2006, in a three-count Indictment for

unlawfully possessing a firearm (a semiautomatic pistol) while trafficking in drugs, in violation

of 18 U.S.C. § 924(c)(1); unlawfully possessing the same firearm after having been convicted of

a felony, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2); and unlawfully possessing marijuana,

in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D) (Docket No. 1, Indict.).  He is alleged to have

possessed this contraband on October 28, 2006 (id.).

---

[1]In support of this motion, defendant filed his attorney's affirmation, Docket No. 23, post-hearing memorandum of law, Docket Nos. 30, 31 (with corrected signature), and reply memorandum in response to the Government's post-hearing submission (with exhibit, a timeline of events), Docket No. 33.  In opposition, the Government filed its Response, Docket No. 24, and the Government's post-hearing memorandum, Docket No. 32.

According to defendant in his motion, a 911 call was made by an unidentified woman who described a man in a tan shirt driving a white car parked in front of a bar.  This woman passed the telephone to her son, who stated that he saw a man in a camouflage jacket with fur trim and an orange lining wearing a long, tan shirt with a gun.  The son stated that the man he observed was a black male, between the ages of 25 and 30, in a white four-door Chevrolet, and gave the license plate number for that vehicle.  (Docket No. 23, Def. Atty. Affirm. at 2; see Docket No. 30, Def. Memo. at 2 n.2.)  Defendant argues that this was all the information furnished to the police and that it identified another person other than him (Docket No. 23, Def. Atty. Affirm. at 3).  Three Buffalo Police Department officers responded to this 911 call and saw a black male (the defendant), sitting in a car with a different license plate number (id.).  Defendant denies committing any crime or raising any suspicion to warrant a Terry stop (id.).

The Government initially responded that the police officers did not approach defendant merely on the basis of the 911 call.  The police also spoke to an unnamed witness on the sidewalk who informed them that the driver of a nearby white car (who matched the description from the 911 call) had a gun.  (Docket No. 24, Gov't Response at 2).  That white car then pulled away.  The officers stopped the car and asked the driver if he had any guns in the car.  Defendant responded that he did not have any weapons but admitted that he had marijuana, handing a plastic bag containing ten vials of the substance.  (Id.)  The officers then ordered defendant out of the car.  As he exited, he pushed the officers and attempted to run away.  The officers soon caught him and placed him under arrest.  (Id.)  Defendant, however, denies attempting to flee and that he was under a Terry stop once the police had stopped his vehicle (Docket No. 23, Def. Atty. Affirm. at 3).  Defendant states that he was handcuffed after he turned over the marijuana (id.).

2

A subsequent search incident to defendant's arrest found a loaded 9-mm. pistol under the driver's seat and $932 on defendant's person (Docket No. 23, Gov't Response at 2-3; Docket No. 23, Def. Atty. Affirm. at 3).

*Motion to Suppress*

Defendant moved for discovery and to suppress evidence (Docket No. 23). He argued that the only basis documented for stopping him was the 911 call (id. Def. Atty. Affirm. at 4). Defendant sought to suppress all evidence and defendant's statements, and a suppression hearing (Docket No. 23, Def. Atty. Affirm. at 8). The Government conceded that a suppression hearing was required here (see Docket No. 24, Gov't Response at 1-2, 3). This Court granted in part and denied in part much of this motion (granting the requested hearing) and scheduled a suppression hearing (Docket Nos. 26, 27). Eventually, this hearing was conducted on August 22, 2007 (Docket Nos. 27, 28). Post-hearing submissions were due thirty days from receipt of the transcript of this hearing (Docket No. 28), which was filed on September 21, 2007 (Docket No. 29), and were timely filed by defendant (Docket No. 31, Oct. 23, 2007) and the Government (Docket No. 32, Oct. 25, 2007). Defendant then submitted a post-hearing reply memorandum on November 5, 2007 (Docket No. 33), and the motion was deemed submitted as of defendant's last filing.

*Suppression Hearing*

At the suppression hearing, Buffalo Police officers Anthony Szymkowiak and Jason Mayhook testified for the Government; defendant did not call any witnesses. The Government offered into evidence defendant's CPL 710.30 statement (Aug. 22, 2007, hearing Gov't Ex. 8; Docket No. 29, Tr. at 36-37). Defendant offered into evidence the recording of the 911 call

(Aug. 22, 2007, hearing Def. Ex. B; Docket No. 29, Tr. at 22, 55) and the transcript of that call (Aug. 22, 2007, hearing  Def. Ex. A; Docket No. 29, Tr. at 19).

Officer Szymkowiak testified that he responded to that 911 call on October 28, 2006, at approximately 4 am to the Humboldt Inn, 347 East Delavan Avenue, Buffalo (at the corner with Humboldt Parkway), responding to a call of a man possessing a gun or a man having been shot (Docket No. 29, Tr. at 3-4, 15).  That 911 call described the man as a black man driving a Chevrolet Lumina, wearing a camouflage coat with a fur collar (id. at 4-5).  Szymkowiak testified that he had come to the Humboldt Inn before for other police calls, for fights, narcotics possession and weapons possession (id. at 5).  Two to three minutes later, he arrived at the Humboldt Inn and saw a black man in camouflage coat in front a white Chevrolet Lumina (id. at 6).  That vehicle had a different license plate number than the one reported in the 911 call (id. at 18-19).

Szymkowiak patted down this man wearing the camouflage coat.  This man then said that the person the officer was looking for was pulling away in another Chevrolet Lumina parked on Humboldt Parkway.  That second Lumina was being stopped by Officer Mayhook.  (Id. at 6-7.) Szymkowiak went to assist by restoring order (a crowd was beginning to form) when marijuana was found in the second Lumina (id. at 8).  The driver of that vehicle (identified in court by Szymkowiak as the defendant) fled by foot from the Lumina (id. at 8-9, 10).  That driver was then apprehended and read his Miranda rights (id. at 11-14; Aug. 22, 2007, hearing Gov't Ex. 7).

Officer Mayhook then testified that the 911 call identified a black man with a gun in a white Chevrolet with tinted windows wearing a camouflage jacket (Docket No. 29, Tr. at 25, 26, 39-40).  Mayhook did not recall if the age of the man was given in that call, or the vehicle's

license plate, or whether the caller noted that a gun butt was visible (id. at 40-41).  He also testified to prior incidents he had at the Humboldt Inn involving drug and weapons possession arrests he made there (id. at 26-27).  Mayhook stated that he saw one man meeting that description and then he saw a second white Chevrolet Lumina (id. at 26-27).  Mayhook stopped the second Lumina, asking the driver how many people were in the vehicle and instructing the driver to keep his hands on the steering wheel (id. at 27-28).  The driver (the defendant) answered that he was the only one in the vehicle (id. at 28).  At that time, Mayhook said that the driver was not removed or placed under arrest (id.).

Mayhook said that Szymkowiak's partner, Officer Alvarez, approached the passenger side of this second Lumina and told the driver about the 911 call, asking if there were any guns in the vehicle (id. at 28-29).  The driver denied that there were any guns but stated that he had "weed," handing a plastic bag with marijuana to the officer from the right side of the seat or console (id. at 29-30).  The driver then asked if he could go, Mayhook said that he could not and ordered him out of the Lumina (id. at 30).  Mayhook then conducted a pat down search of the driver, as a security precaution and incident to placing the driver under arrest (for possession of marijuana), and found no weapons on him (id. at 30, 31).  Mayhook testified that, at this point, the driver was being detained (id. at 31).  As the driver was being arrested, he pushed off the officer, wriggled out of his jacket (held by Mayhook), and fled (id. at 31-32).  The driver was apprehended in a neighboring yard about fifteen to twenty seconds later, cuffed and placed in a police cruiser (id. at 32).

Mayhook then searched the second Lumina, finding a .9 mm handgun under the driver's seat (id. at 33).  Mayhook testified that the driver then spontaneously stated that the gun was not

his, that it belonged to the other man in the camouflage jacket (id. at 33-34; see Aug. 22, 2007, hearing Gov't Ex. 8). The driver said this before being advised of his Miranda rights and Mayhook denied that the driver was being questioned when he made that statement (Docket No. 29, Tr. at 34). After Szymkowiak advised the driver of his Miranda rights, Mayhook asked the driver about the gun (id. at 34-35). The driver answered that "my man" borrowed the car and that it was the borrower's gun (id. at 35). He said that he handed the marijuana to Mayhook because the driver was on parole and did not want to be caught with it, admitting that the marijuana and the car were his (id.).

After the Government rested, defendant argued that the officers relied upon the anonymous 911 tip to justify the stop, that the anonymous caller gave one license plate number while defendant's vehicle had a different plate number, and that tip lacked police corroboration. Defendant concluded that the stop was illegal and the subsequent searches were fruit of the poisonous tree.

*Post-Hearing Arguments*

In response to the Government's post-hearing submission, defendant contends that the Government omitted key events leading to defendant's arrest. Defendant points out that Officer Szymkowiak approached the first man in the camouflage jacket as the primary suspect from the 911 tip. As Szymkowiak was patting down this man, his partner, Officer Alvarez, was approaching defendant's Chevrolet Lumina. As the first man was pointing out defendant's vehicle as the one sought by Szymkowiak, Officer Mayhook had activated his overhead lights and approached defendant's stopped vehicle and had no idea of what the other officers were told. (Docket No. 33, Def. Reply Memo. at 1-2, Ex. A.) Defendant contends that he was stopped

6

when Officer Mayhook approached his vehicle and ordered him to place his hands on the

steering wheel, completing the Terry stop (id. at 3).  Defendant concludes that Officer Mayhook

stopped him based solely on the anonymous 911 tip and defendant argues that the imputed

knowledge doctrine is not applicable here (id. at 4-5).

### DISCUSSION

I.      Motion to Suppress Evidence

Defendant moves to suppress evidence seized upon his arrest (the 9-mm. pistol and

marijuana).  He argues that there was no reasonable suspicion to stop and detain him.  He also

seeks to suppress his statements made to the police, primarily the statement where he admits that

he possessed marijuana and those denying possession of the firearm.

Reviewing reasonable suspicion determinations under Terry v. Ohio, 392 U.S. 1 (1968),

and its progeny is assessed on the totality of the circumstances supporting the investigatory stop,

United States v. Cortez, 449 U.S. 411, 417-18 (1981); United States v. Muhammed, 463 F.3d

115, 121 (2d Cir. 2006).  As noted by the Second Circuit in Muhammed, 463 F.3d at 121, "an

officer may 'draw on [his] own experience and specialized training to make inferences from and

deduction about the cumulative information available to [him] that "might well elude an

untrained person." ' " (Quoting United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal

citations omitted)).  "But only 'the facts available to the officer at the moment of the seizure'

may be evaluated," id. (quoting Terry, supra, 392 U.S. at 21-22) to determine whether the officer

had reasonable suspicion.

Thus, these events can be broken down into (a) the authority to stop defendant's vehicle (here, in particular, the anonymous 911 call), (b) the initial stop, (c) the probable cause for defendant's subsequent arrest.

A.    Initial Stop and 911 Call

1.    <u>Florida v. J.L.</u>

Defendant argues that the 911 call tip did not furnish sufficient indicia of reliability to warrant the stop of defendant's vehicle, <u>see</u> <u>Florida v. J.L.</u>, 529 U.S. 266, 271 (2000) (Docket No. 23, Def. Atty. Affirm. at 5-7; <u>see</u> Docket No. 29, Tr. at 49).

In response, the Government argues that <u>J.L.</u> does not apply here.  The Government contends that one key piece of information in the 911 call would disappear had the officers not attempted to detain the Lumina.  The Government points out that the 911 call tip was substantiated by the interview with the anonymous man in the camouflage jacket at the scene, who stated that the person they sought was in the other Lumina. (Docket No. 32, Gov't Memo. at 6; <u>see</u> Docket No. 29, Tr. at 50-51.)  The Government argues, in its post-hearing memorandum, that the collective or imputed knowledge doctrine, <u>see</u> <u>United States v. Hensley</u>, 469 U.S. 221, 230-33 (1985); <u>United States v. Colon</u>, 250 F.3d 130, 135 (2d Cir. 2001); <u>United States v. Valez</u>, 796 F.2d 24, 28 (2d Cir. 1986), that the knowledge of the officer (Szymkowiak) who met with the anonymous confirming witness could be imputed to the arresting officer (Mayhook), applies here to justify this stop (Docket No. 32, Gov't Memo. at 7).  The Government argues that defendant's activities after initiation of the <u>Terry</u> stop can be used to determine whether there was reasonable suspicion for the stop (<u>id.</u> at 8-9).  Defendant's presence in a high crime area and his flight when approached by officers also are relevant to determine whether the circumstances

were sufficiently suspicious for the officers to stop defendant (id. at 9).  The Government concludes that defendant's subsequent actions, in attempting to flee and later handing over marijuana to Officer Mayhook, removes any taint on defendant's initial stop (id. at 10).

Defendant argues in his post-hearing memorandum that the Terry stop resulted from an anonymous tip (of a black man, between the ages of 25 and 30, wearing a camouflage coat, near a white Chevrolet Lumina, bearing one plate number) to the 911 from two anonymous informants, where the 911 dispatcher relayed different facts to the police officers at the scene (Docket No. 31, Def. Post-Hearing Memo. at 3).  He contends that, like J.L., the officers failed to corroborate this anonymous tip, by, for example, interviewing the anonymous informants (id. at 9).  Defendant concludes that this tip lacked the sufficient "indicia of reliability," see Adams v. Williams, 407 U.S. 143, 147 (1972), to form the basis for reasonable suspicion to stop defendant (id.).  After stopping another, unnamed person (who met the tip's description), the police stopped defendant (id. at 9-10).  Defendant points out that case law involving Terry stops arising from anonymous tips require a significant amounts of corroboration (id. at 11), see United States v. Elmore, 482 F.3d 172, 181 (2d Cir. 2007); J.L., supra, 529 U.S. 266.

In reply regarding imputed knowledge, defendant argues that it is not applicable here and that, under that doctrine, "the information actually possessed by the officers [making the stop] must be sufficient to justify the stop or arrest," United States v. Nafzger, 974 F.2d 906, 911 (7th Cir. 1992) (Docket No. 33, Def. Reply Memo. at 5; cf. Docket No. 32, Gov't Post-Hearing Memo. at 7 (citing, quoting this decision)).  He contends that the first man's statement (used by the Government to corroborate the anonymous tip) is self-serving and of insufficient reliability itself to justify stopping defendant (Docket No. 33, Def. Reply Memo. at 5) and the evidence

9

showed that Officer Mayhook stopped defendant not on the basis of that second, anonymous tip (id.).  As for relying upon post-initiation events to support the validity of the stop, defendant argues that would apply only if the suspect fails to submit to police authority (id. at 6, distinguishing United States v. Swindle, 407 F.3d 562 (2d Cir. 2005)).  Here, defendant submitted to the police authority once Officer Mayhook turned on his overhead lights by pulling over and later following orders (such as keeping his hands on the steering wheel) (id. at 6-7).

"Reasonable suspicion may be based upon information from a confidential informant so long as the tip bears sufficient 'indicia of reliability.' [Adams v. Williams, 407 U.S.  143, 147 (1972)]," United States v. Elmore, 482 F.3d 172, 179 (2d Cir. 2007).  As noted by the Second Circuit in Elmore, id., "courts must assess whether an informant's tip establishes reasonable suspicion under the totality of the circumstances approach set forth in Illinois v. Gates, 462 U.S. 213, (1983), though obviously a lesser showing is required."  "The informant's 'basis of knowledge' and 'veracity' (i.e., how he knows and why we should believe him) remain highly relevant to a determination of either probable cause or reasonable suspicion.  See [Alabama v. White, 496 U.S. 325, 328-29 (1990)]," id.  The court noted that, even if "the informant's tip, standing alone, lacks sufficient indicia of reliability because it does not do enough to establish the informant's basis of knowledge and veracity, it may still support a finding of reasonable suspicion if sufficiently corroborated through independent police investigation."  Id. (emphasis added) (citing Draper v. United States, 358 U.S. 307 (1959)).  On a sliding scale (depending upon whether the informant is known, reliable, and corroborated), the Second Circuit held that "where the informant is completely anonymous, as in White, [496 U.S. 325], a significant amount of corroboration will be required," id. at 181.  That court found that the informant in that

appeal "gave the police enough information about herself to allow them to identify her and track her down later to hold her accountable if her tip proved false," id. at 182.  That informant told the police her name, two telephone numbers to reach her and her relationship with defendant, id., and the Second Circuit held that the district court erred in finding that informant to be anonymous in those circumstances because the police did not definitively confirm her identity, id., reversing suppression of evidence found in defendant-appellee's car, id. at 184.

The Elmore court cited two Supreme Court decisions involving anonymous informants, id. at 177-78, 180.  In J.L., supra, 529 U.S. 266; see Elmore, supra, 482 F.3d at 180, the police received a completely anonymous tip that a young black man in a plaid shirt at a particular bus stop had a gun.  529 U.S. at 268.  There the Supreme Court held that the anonymous tip, plus its corroboration by the mere fact that a black man with a plaid shirt was at the bus stop, did not constitute reasonable suspicion to stop and frisk the man.  Id. at 271-72.  The J.L. Court recognized that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop,'" id. at 270 (quoting White, supra, 496 U.S. at 327).  The tip there "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility," id. at 271.  Although providing an accurate description of the subject, the tip did not necessarily show the tipster's knowledge of concealed criminal activity, id. at 272.

In Alabama v. White, supra, 496 U.S. at 329, 331-32; see Elmore, supra, 482 F.3d at 180, the Court held that an anonymous tip (which by itself would not have justified an investigative stop) justified a Terry stop because both innocent details and predictive information were corroborated,.  The police there observed conduct predicted accurately by the tip (that the suspect

11

would leave an apartment at a particular time and drive to a particular place carrying drugs),

confirming that the tipster had insider knowledge about the suspect and her criminal activity that

made the tipster credible, White, supra, 496 U.S. at 332; see also J.L., supra, 529 U.S. at 270-71,

but the Court held that White was a close or borderline case, see J.L., supra, 529 U.S. at 271.

The J.L. Court, however, found that the tip there "surely falls on the other side of the line" than

White, id.

       2.      Application

The traffic stop here was based upon an anonymous 911 call identifying a black man with

a gun in a white Chevrolet, with the call giving one license plate number for the vehicle but the

testifying officers not recalling that detail.  Unlike the tip in J.L., 529 U.S. at 268, the 911 call

was recorded, but, like J.L., nothing else is known about the anonymous callers.  As with J.L.,

absent the tip, "the officers had no reason to suspect" anyone of illegal conduct, id.  In the case at

bar there were two white Chevrolet Luminas driven or near black males that fit the description

given in the tip.  Cf. id. (at scene were three black males, with one wearing the clothing described

by the tip).  J.L. focused upon the reliability of the anonymous tip in asserting illegality, id. at

272.  The danger implicit with anonymous sources as reasonable suspicion for Terry stops is

misidentification where there is no means to verify the tip's accuracy.  Here, the reliability issue

is which person in which car possessed the firearm as claimed by the anonymous sources.

Under J.L., the Government's reliance on defendant's post-investigative stop actions is

misplaced, see id. at 271 ("the reasonableness of official suspicion must be measured by what the

officers knew before they conducted their search," emphasis added).  Defendant's purported

suspicious activities during the stop do not justify the stop.

The Government argues that the first anonymous man in a camouflage jacket corroborated the anonymous 911 tip.  As defendant notes, however, that person had a self-interest to identify any other person as being the one sought (in fact he was the first suspect questioned on the basis of that tip) and the police failed to probe into the knowledge or credibility of this person (see Docket No. 33, Def. Reply Memo. at 5, 7).  How did these officers know to credit the first man?  This first, anonymous man (who fit the description given by anonymous tipsters in 911 call) was hardly a disinterested bystander.  He had a vested interest in having the police's scrutiny focused upon anyone other than himself.  This anonymous first man may be "my man" who borrowed defendant's car earlier that defendant referred to in explaining how the firearm was found to be in his car (see Docket No. 29, Tr. at 35).  We have no indication of this first man's reliability or the basis of his knowledge or his veracity, see White, supra, 496 U.S. at 329; J.L., supra, 529 U.S. at 270.  How did that first man know that the driver of the second vehicle (the present defendant) was the person the officers sought on the 911 tip?

The two anonymous tips here do not provide a "significant amount of corroboration," Elmore, supra, at 181, of each other in this instance to find that either the 911 tip or the anonymous man were reliable.  This is not an instance where two, independent but anonymous sources corroborate each other to supply reasonable suspicion to conduct a Terry stop.  Each anonymous source required sufficient corroboration to justify the stop, see Elmore, supra, 482 F.3d at 181.  Since the officers testified that they did not know the name of this first person and did not make any inquiry about that (the only inquiry of him being a pat down search–which might have discounted him as possessing the firearm), there was not "sufficient[] corroborat[ion] through independent police investigation," id. at 179, to corroborate the anonymous 911 tip.

13

Similarly, the anonymous 911 call did not corroborate the anonymous man (who also fit the description given in that call).

This case is closer to <u>J.L.</u>, where the Supreme Court affirmed suppression based upon the anonymous tip, 529 U.S. 266. As in our case, the tip merely described the subject, what he was wearing, and that he had a firearm, without anything more, without stating a basis for knowing that he was engaged in illegal activity. Both this case and <u>J.L.</u> had generic descriptions by anonymous persons who gave no further information to allow the police to corroborate the tips. <u>J.L.</u> would be nearly identical to the pending case if one of the three people with the defendant there dressed like him and anonymously pointed him out as the one sought by the police.

Further, the imputed knowledge doctrine does not justify this stop since Officer Mayhook independently stopped defendant while Officers Szymkowiak and Alvarez were stopping and purportedly gathering information from the first, anonymous person. Officers approached second person (defendant here) based upon the anonymous 911 tip's description, not on independent investigation by the police or statement by the then-suspected first man. Therefore, this tip by itself lacks confirmed veracity to be the basis for reasonable suspicion, and defendant's stop based upon that anonymous tip should be held to be **unconstitutional** and evidence found during that stop should be **suppressed**.

B.     Probable Cause for Arrest

The Government contends that the second Lumina defendant was driving was detained because the driver attempted to flee and, once the vehicle was stopped, defendant voluntarily handed the officers the marijuana he possessed (Docket No. 32, Gov't Memo. at 3-4, 10). At that point, defendant was under arrest and the subsequent search of the Lumina (leading to the

discovery of the handgun) was incident to that lawful arrest.  (See Docket No. 29, Tr. at 51-52.)

Defendant argues, however, that the stop occurred before that point; that he was stopped when

Officer Mayhook approached his vehicle with the overhead lights on, Mayhook's hand on his

weapon, and ordered defendant to keep his hands on the steering wheel (Docket No. 33, Def.

Reply Memo. at 2; see Docket No. 29, Tr. at 41, 43 (Mayhook)).  Before reaching this point, the

legitimacy of the stop dictates whether the subsequent activities were legitimate.  As stated

above, the anonymous tips were not otherwise corroborated and failed to provide sufficient

reasonable suspicion to stop defendant's vehicle.  The subsequent events (whenever the stop

actually occurred and was effectuated) is tainted by the insufficiency for the grounds for that

stop.  Thus, this evidence **should  be suppressed as fruit from the poisonous tree**.

II.     Defendant's Statement

        Alternatively, defendant argues that his statements prior to being advised of his Miranda

rights should be suppressed.  The Government contends that he spontaneously offered that he had

marijuana and later spontaneously stated that the gun found in the Lumina was not his, without

questioning by the police (Docket No. 32, Gov't Memo. at 10-12).  Both statements were made

prior to defendant being advised of his Miranda rights.  When defendant was asked if he had a

gun, leading to his volunteered answer that he had "weed," he was not under arrest.  There was

no testimony that the officers had their weapons drawn (although Officer Mayhook testified that

he recalled having his hand on his weapon as he approached defendant's vehicle, Docket No. 29,

Tr. at 43) or other circumstances that may indicate that defendant was coerced in answering or

disclosing his possession of marijuana.  Apart from the circumstances of the stop leading to this

conversation, these statement should not be suppressed as being voluntary admissions by defendant.

These statements, however, **should  be suppressed** as fruit of the poisonous tree, since (as discussed above) a constitutional violation occurred prior to defendant making these voluntary statements.

### CONCLUSION

Based upon the above, it is recommended that remaining portion of defendant's omnibus motion, seeking to suppress seized evidence and defendant's statements (Docket No. 23), be **granted**.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) and W.D.N.Y. Local Civil Rule 72.3(a).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME OR TO REQUEST AN EXTENSION OF SUCH TIME WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT DISTRICT COURT'S ORDER ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v.

Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d Cir. 1995); Wesolak

v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

  The District Court on de novo review will ordinarily refuse to consider arguments, case

law and/or evidentiary material which could have been, but was not, presented to the Magistrate

Judge in the first instance.  See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale

Electric Co., 840 F.2d 985 (1st Cir. 1988).

  Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72.3(a)(3),

"written objections shall specifically identify the portions of the proposed findings and

recommendations to which objection is made and the basis for such objection and shall be

supported by legal authority."  **Failure to comply with the provisions of Rule 72.3(a)(3) may**

**result in the District Court's refusal to consider the objection.**

  SO ORDERED.

          /s/ Hugh B. Scott

            Hon. Hugh B. Scott
           United States Magistrate Judge

Dated: Buffalo, New York
   November 19, 2007